In the Matter of **METROPOLITAN OFFSET PRINTERS, INC. and H. M. L. Shoppers, Inc., Garden State News; Union Sun Publishing Co.; Leader Publishing Co.; Springfield Sun Publishing Co.; Echo Publishing Co.; Berkeley Heights Beacon, Inc.; Fanwood Independent; Scotch Plains Times; Homemakers Digest, Inc. (related and affiliated corporations), Joseph J. Clarick, as Trustee, Appellant.**

**No. 16746.**

United States Court of Appeals
Third Circuit.

Argued Jan. 18, 1968.

Decided March 25, 1968.

Allan L. Tumarkin, Newark, N. J., (Kleinberg, Moroney & Masterson, Joseph J. Clarick, Trustee, Newark, N. J., on the brief), for appellant.

John J. McLaughlin, Newark, N. J., for appellee.

Before HASTIE, Chief Judge, and GANEY, Circuit Judge, and WEINER, District Judge.

## OPINION OF THE COURT

HASTIE, Chief Judge.

In a bankruptcy proceeding, American Guaranty Corporation filed a reclamation petition for a Vanguard Web Offset Press and other printing equipment which was in the possession of Metropolitan Offset Printers, Inc. when Metropolitan became bankrupt. Metropolitan's trustee resisted this claim and the referee sustained his position as to the Vanguard press, treating American Guaranty's title as an unrecorded security interest. American Guaranty appealed from that determination and the district court, reversing the referee's decision, held that the press was reclaimable as property of American Guaranty in possession of the bankrupt as a bailee. This appeal followed.

The history of the chattel in suit begins with a letter of October 14, 1960, written

on behalf of Publication Offset Printers, Inc., not a party to this litigation, to American Guaranty expressing a desire to lease a described type of Vanguard press to be delivered February 1, 1961. American Guaranty then ordered such a press from a manufacturer, Cottrell, who then sent to American Guaranty for signature a conditional sale contract covering the proposed purchase. American Guaranty altered the caption of the instrument by typing "Publication Offset Printers, Inc. * * * and/or" above the name of American Guaranty as "purchaser". Both American Guaranty and Publication also signed the contract as "purchaser". Publication also signed a prospective "lease" of the press from American Guaranty. Only after all of this was done did American Guaranty return the signed conditional sale contract to Cottrell. The press was not delivered by the manufacturer to Publication until July, 1961.

On August 10, 1961, American Guaranty completed payment to Cottrell of the full amount of the purchase price as set out in the conditional sale contract. A week later American Guaranty, as lessor, signed the lease which had been executed several months earlier by Publication as lessee.

Publication paid the monthly rental reserved under the lease until May, 1963, and shortly thereafter was adjudicated a bankrupt. It does not appear that Publication's trustee made any claim to the press or that it was listed as an asset of Publication in bankruptcy.

At this juncture, Metropolitan Offset Printers, a new corporation not owned by Publication's stockholders, acquired possession of the premises recently occupied by Publication and undertook to conduct a printing business there. American Guaranty did not undertake to remove the Vanguard press, a heavy piece of equipment that had been cemented to the floor. Instead, it entered into negotiations with Metropolitan with a view to leasing the press to that new concern and, in the meantime, permitted Metropolitan to use the press.

The negotiations were more protracted than had been anticipated, continuing from the summer of 1963 until February, 1964. The district court properly pointed out that the "early negotiations were directed toward an assumption of Publication's lease" by Metropolitan. During that period question arose about compensation to American Guaranty for the interim use of the press and American Guaranty insisted that for interim use Metropolitan should pay $2600 monthly, the amount of rent previously paid by Publication. In a letter dated October 16, 1963, counsel for American Guaranty advised Metropolitan that "the deal will be considered off" unless Metropolitan should within five days execute "assumption leases" and pay "two months back rental". At that time Metropolitan had paid nothing for the use of the press. Receiving no answer to the October 16 letter, counsel sent a telegram to Metropolitan, threatening to repossess the press unless "two months rental" should be paid immediately, but also agreeing to continue negotiations for the "assumption of the lease" if this payment should be made. The sum thus demanded, $5,200., was paid November 8, 1963.

From this point on negotiations seem to have focused upon terms for a new lease rather than the assumption of the old. A letter of November 21, 1963 from American Guaranty's counsel speaks of future negotiations for "a new lease" and describes the $5,200. received two weeks earlier as "earnest money". A new proposal was also included for compensation for use of the press during the preceding months.

A month later counsel acknowledged receipt of an additional $3,500. from Metropolitan and stated that this was being "applied against lease payments due" at the rate provided in the old Publication lease. Metropolitan also paid sums aggregating about $1,000. directly to the manufacturer of the press for parts and servicing while it was using the press.

In February, 1964, Metropolitan executed a lease substantially differing from

the old Publication lease, calling for a first payment of rent on May 11, 1964, and sent it to American Guaranty for its signature as lessor. Apparently, this action reflected belief by Metropolitan that negotiations had reached a stage of substantial informal agreement. However, American Guaranty did not sign this lease, allegedly because of continuing doubt about the financial responsibility of Metropolitan.

On May 10, 1964, Metropolitan filed its present petition in bankruptcy. We have to decide what the rights of the parties with reference to the press were at that time in the light of the above outlined rather fragmentary evidence of their conduct, their correspondence and their common undertaking.

We agree with the district court that when American Guaranty completed payment for the press, title to the chattel vested in it free of any security interest of the manufacturer. True, Publication had possession of the chattel and continued to use it under the leasing arrangement that Publication had originally solicited. It is also true that American Guaranty had elected to add to its own name as purchaser in the conditional sale agreement the name of Publication. Yet, the record indicates that Publication never claimed any right of ownership but consistently treated its rights and obligations as defined by the lease from American Guaranty to Publication. The failure of Publication's trustee in bankruptcy or any other person interested in the bankrupt estate of Publication to assert any claim to the press is a significant indication of common understanding that Publication was merely a lessee whose right to possession had terminated.

Thus, when Metropolitan acquired possession of the premises vacated by Publication, it acquired possession of the press which American Guaranty owned and was entitled to remove but did not do so while the parties bargained for a mutually agreeable arrangement under which Metropolitan could continue to use the press in its business. At that time the monthly rate of rental in the Publication lease was used by the parties as a measure of the fair value of the use of the press until they could arrive at a formal long term agreement. But Metropolitan's bankruptcy intervened before any lease was executed by American and on the day preceding the effective date stated in a proposed lease signed by Metropolitan and submitted to American for its approval and execution.

■■■■ Whether that lease, if and when signed by American, could have been construed as transferring property to Metropolitan, reserving an unrecorded security interest to American, as to which see 4A COLLIER BANKRUPTCY, 14th ed., § 70.18[13], we find it unnecessary to decide. For, as the district court properly found on this record, expression of mutual assent to a transfer on the terms of the proposed lease was never completed and the effective date stated in the proposed lease had not arrived. American Guaranty never obligated itself to allow Metropolitan anything more than a right to possession of its chattel, terminable at will, until negotiations between them should either fail or culminate in a long term arrangement. Cf. B. F. Hoffman Inc. v. Richman, 3d Cir., 1935, 75 F. 2d 823; Goldman v. Shreve, 3d Cir., 1920, 263 F. 74. Absent a transaction giving the possessor some equity in the chattel, there is no possible basis for treating the owner's title as a mere "security interest", within the meaning of the controlling Section 1–201(37) of the Uniform Commercial Code, N.J.S.A. 12A:1–201 (37). See 4A COLLIER, BANKRUPTCY, 14th ed., § 70.18[4].

Metropolitan's trustee has not established that Metropolitan enjoyed anything more than possession of the press at the will of the owner, American Guaranty, or that American Guaranty's title was a reserved security interest as distinguished from full and unqualified ownership.

The judgment will be affirmed.